UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| JERRIS W., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:20 CV 121 JMB |
| | ) | |
| | ) | |
| ANDREW M. SAUL, | ) | |
| Commissioner of Social | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This action is before the Court pursuant to the Social Security Act, 42 U.S.C. §§ 401, et seq. ("the Act"). The Act authorizes judicial review of the final decision of the Social Security Administration denying Plaintiff Jerris W.'s ("Plaintiff") application for disability benefits under Title II of the Social Security Act, see 42 U.S.C. §§ 401 et seq. All matters are pending before the undersigned United States Magistrate Judge with the consent of the parties, pursuant to 28 U.S.C. § 636(c). Substantial evidence supports the Commissioner's decision, and therefore it is affirmed. See 42 U.S.C. § 405(g).

## I.     Procedural History

On August 24, 2017, Plaintiff filed an application for disability benefits, arguing that his disability began on June 23, 2016,[1] as a result of extreme pain in his feet and low back, depression,

---

[1] Plaintiff previously filed for disability benefits, alleging disability beginning on September 25, 2013. An Administrative Law Judge ("ALJ") denied his application in a decision dated June 22, 2016. (Tr. 143-161)

anxiety, and fractured and degraded bones in his feet.[2]  (Tr. 244-50)  On January 17, 2018, Plaintiff's claims were denied upon initial consideration.  (Tr. 185-89)  Plaintiff then requested a hearing before an ALJ.  Plaintiff appeared at the hearing (with counsel) on August 20, 2019, and testified concerning the nature of his disability, his functional limitations, and his past work.  (Tr. 74-96)  The ALJ also heard testimony from Kimberly W., Plaintiff's spouse, and Sherry Ronning, a vocational expert ("VE").  (Tr. 88-94, 341-42)  The VE opined as to Plaintiff's ability to perform his past relevant work and to secure other work in the national economy, based upon Plaintiff's functional limitations, age, and education.  (Id.)  After considering Plaintiff's testimony, his wife's testimony, and the VE's testimony, and after reviewing the other relevant evidence of record, the ALJ issued a decision on September 11, 2019, finding that Plaintiff was not disabled, and therefore denying benefits.  (Tr. 11-20)

Plaintiff sought review of the ALJ's decision before the Appeals Council of the Social Security Administration.  (Tr. 1-6)  On May 27, 2020, the Appeals Council denied review of Plaintiff's claims, making the September 11, 2019, decision of the ALJ the final decision of the Commissioner.  Plaintiff has therefore exhausted his administrative remedies, and his appeal is properly before this Court.  See 42 U.S.C. § 405(g).

---

[2] Plaintiff did not list illiteracy as a basis for disability in his application or in his request for reconsideration.  Failure to allege a disabling impairment in an application for disability benefits is a significant factor in determining the severity of an alleged impairment.  See e.g., Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001) (holding fact that claimant did not allege disabling condition in his application significant, even if evidence of the impairment is later developed).  However, Plaintiff offered illiteracy as a basis for disability at his administrative hearing.  The evidence that his alleged illiteracy impaired Plaintiff's ability to perform basic work activities is limited to Plaintiff and his wife's hearing testimony.

As explained below, the Court has considered the entire record in this matter. Because the decision of the Commissioner is supported by substantial evidence, it will be affirmed.

## II.   Medical Records

The administrative record before this Court includes medical records concerning Plaintiff's health treatment from March 7, 2016, through September 23, 2019. The Court has considered the entire record. The following is a summary of pertinent portions of the medical records relevant to the matters at issue in this case.

### A.   St. Francis Pain Management Center – Dr. Andrew Walker (Tr. 102-10)

On September 23, 2019, Plaintiff presented for pain management treatment for back and leg pain with Dr. Andrew Walker. Dr. Walker started a dorsal column stimulator trial as treatment.

### B.   Cardiovascular Institute of Southern Missouri – Dr. Hanumanth Reddy (Tr. 111-42)

Between July 16, 2018, through October 5, 2018, Dr. Hanumanth Reddy treated Plaintiff's cardiology issues.

On July 16, 2018, Dr. Reddy performed a stress test prior to Plaintiff having peripheral vascular surgery. Plaintiff reported having difficulty hearing but no difficulty walking.

In follow-up treatment on July 30, 2018, Dr. Reddy found Plaintiff had a history of hypertension, smoking, hyperlipidemia, chronic back pain, and peripheral stenting and had been scheduled for peripheral vessel bypass surgery. Plaintiff reported chest pain on exertion and shortness of breath when walking. Dr. Reddy noted that Plaintiff had a normal gait and advised Plaintiff to stop smoking. On August 14 and 21, 2018, Dr. Reddy cleared Plaintiff for peripheral vascular surgery and found his blood pressure to be well controlled.

In follow-up treatment on September 27 and October 5, 2018, Dr. Reddy found Plaintiff to be doing well.

C. **Advanced Pain Center - Dr. Oluseyi Ogundimu** (Tr. 344-435, 521-57, 628-768)

Between November 1, 2016, and May 1, 2019**,** Dr. Oluseyi Ogundimu treated Plaintiff's chronic low back pain.

On November 1, 2016, Plaintiff established care at Advanced Pain Center. Plaintiff indicated that he was unemployed and had applied for disability. Plaintiff reported having chronic pain syndrome following surgery and failing to respond to conservative treatment, including physical therapy and pain medications. Diagnostic testing showed mild lumbar spondylosis, mild facet arthropathy, multilevel degenerative disc disease, and multilevel stenosis. Physical examination showed a normal range of motion of Plaintiff's cervical and thoracic spine and no tenderness to palpation. Dr. Ogundimu's examination showed mild tenderness in the center of Plaintiff's spine and around facet joints. Dr. Ogundimu recommended administering a caudal block.

On November 28, 2016, Dr. Ogundimu administered a caudal block. On November 29, 2016, Plaintiff reported that the injection, as well as his medications, had helped control his pain. Examination of his cervical and thoracic spines showed no tenderness to palpation and muscle strength 5/5. As to his lumbar spine, Dr. Ogundimu noted mild tenderness in the center of his spine as well as facet joints. Plaintiff reported no adverse effects from his medications. Dr. Ogundimu continued Plaintiff's medication regimen In a post-procedure call, Plaintiff reported having significant improvement of his pain after the injection.

In follow-up treatment on December 27, 2016, Plaintiff reported having low back pain radiating into both his legs, and his medication regimen helped manage his pain. Examination results remained the same. Dr. Ogundimu decided to continue Plaintiff's medication as previously prescribed.

On January 9, 2017, Dr. Ogundimu administered a caudal epidural, noting that Plaintiff reported the last injection helping greater than 80% and improved his daily functioning. In a post-procedure call, Plaintiff reported an 80% pain relief after the injection.

In follow-up treatment on January 23, 2017, Plaintiff reported that the last injection only helped his pain for two days, his pain medications continued to help, and his level of pain at 10/10. Physical examination showed a normal range of motion of Plaintiff's cervical and thoracic spine and no tenderness to palpation. Dr. Ogundimu's examination showed mild tenderness around facet joints. Dr. Ogundimu continued Plaintiff's medications as previously prescribed. On January 30, 2017, Dr. Ogundimu administered a caudal epidural.

During treatment on February 20, 2017, Plaintiff reported back pain in the lumbar region. Dr. Ogundimu noted that Plaintiff's gait was within normal limits. Examination showed no tenderness of Plaintiff's cervical and thoracic spine and moderate tenderness of his fact joints.

On March 13, 2017, Dr. Ogundimu administered a lumbar medial nerve block. In a post procedure call, Plaintiff reported significant improvement and initially 80% improvement after the injection. During treatment on March 20, 2017, Plaintiff reported having low back pain, and his pain being managed by his current medications. Examination of his cervical and thoracic spine showed no tenderness to palpation and moderate tenderness of lumbar spine and around his bilateral facet joints. Dr. Ogundimu continued Plaintiff's medication regimen.

On April 3, 2017, Dr. Ogundimu administered a lumbar medial nerve block. In a post procedure call, Plaintiff reported significant improvement and initially 80% improvement after the injection. During a pain medication follow-up on April 17, 2017, Plaintiff reported his medications helped manage his pain with no side effects. Plaintiff also indicated that his medications had improved his daily functioning, physical activities, and sleep. Dr. Ogundimu

noted that Plaintiff had greater than 80% pain relief after each injection, and he was more active and improved after each block. On April 24, 2017, Dr. Ogundimu administered a lumbar medial nerve block. In a post procedure call, Plaintiff reported significant improvement and initially 80% improvement after the injection

In a pain medication follow-up on May 15, 2017, Plaintiff reported that his pain medications had helped manage his pain and had improved his daily functioning, physical activities, and sleep. During treatment on June 28, 2017, Plaintiff reported having back pain in the lumbar region at level 8/10. Examination of Plaintiff's cervical and thoracic spine showed no tenderness and moderate tenderness of his lumbar spine and around bilateral facet joints. Dr. Ogundimu noted that Plaintiff's gait was within normal limits. Dr. Ogundimu adjusted Plaintiff's medication regimen.

During treatment on July 26, 2017, Plaintiff reported no changes in his low back pain, and his pain was managed with his current medications. Examination results remained the same. Dr. Ogundimu continued Plaintiff's medication regimen.

An August 9, 2017, nerve conduction study of Plaintiff's lower extremities showed normal limits with no evidence of lumbar radiculopathy on either side.

Plaintiff returned on August 23, 2017, and he reported that his medications had helped with his low back pain but he still experienced pain down both of his legs. Examination of his cervical and thoracic spine showed no tenderness to palpation and mild tenderness to his lumbar spine. Dr. Ogundimu observed that Plaintiff's gait was within normal limits. Dr. Ogundimu observed that Plaintiff's affect, posture, and activity do not reflect a pain level as high as 8/10 as reported by Plaintiff.

During treatment on September 20, 2017, Plaintiff reported that his pain medications had helped with his low back pain and a pain level of 8/10. Examination of his cervical and thoracic spines showed no tenderness to palpation and his lumbar spine, mild tenderness. Dr. Ogundimu continued Plaintiff's medication regimen. On September 25, 2017, Dr. Ogundimu administered a sacroiliac joint injection. In a post procedure call, Plaintiff reported significant improvement and initially 80% improvement after the injection.

On October 18, 2017, Plaintiff returned for lumbar pain treatment and reported a pain level of 8/10. Examination of his cervical and thoracic spine showed no tenderness to palpation and his lumbar spine mild tenderness. Dr. Ogundimu noted that Plaintiff's gait was within normal limits. Dr. Ogundimu continued Plaintiff's current pain medication regimen.

During treatment on November 15, 2017, Plaintiff reported no changes in his chronic pain. Examination of his cervical and thoracic spine showed no tenderness to palpation and his lumbar spine moderate tenderness. Dr. Ogundimu continued Plaintiff's medications as previously prescribed. In follow-up treatment on December 13, 2017, Plaintiff reported that his pain had been controlled and a pain level 8/10. Examination of his cervical and thoracic spines showed no tenderness to palpation and his lumbar spine mild tenderness. Dr. Ogundimu continued Plaintiff's medications as previously prescribed.

On January 10, 2018, Plaintiff reported that his pain had been controlled by his medication regimen. Examination of his cervical and thoracic spines showed no tenderness to palpation and his lumbar spine, moderate tenderness. Dr. Ogundimu noted that Plaintiff's gait was within normal limits. Dr. Ogundimu continued Plaintiff's medications as previously prescribed. Based on Plaintiff's treatment history and physical examination Dr. Ogundimu proposed administering

a bilateral joint injection but Plaintiff refused, indicating that the last injection on September 25, 2017, only provided relief for two hours.

In follow-up treatment on February 7, 2018, Plaintiff reported having back pain at a 7/10 level. Examination of his cervical and thoracic spines showed no tenderness to palpation and his lumbar spine mild tenderness. Dr. Ogundimu continued Plaintiff's medications as previously prescribed. On March 7, 2018, Plaintiff reported having burning, back pain. Examination of his cervical and thoracic spines showed no tenderness to palpation and his lumbar spine mild tenderness. Dr. Ogundimu noted that Plaintiff's gait was within normal limits. Dr. Ogundimu proposed administering a bilateral joint injection but Plaintiff refused, indicating that the last injection on September 25, 2017, only provided relief for two hours. Dr. Ogundimu continued Plaintiff's medication regimen.

In follow-up treatment on April 4, 2018, Plaintiff complained of failed back syndrome. Dr. Ogundimu's examination showed same results as previous examination. Dr. Ogundimu noted that Plaintiff had tried several interventional blocks with Plaintiff reporting no relief and continued his medication regimen. On May 2, 2018, Plaintiff reported having low back pain and seeing a neurosurgeon for a spinal code stimulator trial. Dr. Ogundimu's examination showed the same results as earlier examinations. Dr. Ogundimu continued Plaintiff's medication regimen. Plaintiff returned on May 30, 2018, reporting a history of failed back syndrome and moderate to severe pain. Dr. Ogundimu continued Plaintiff's medications as previously prescribed.

In follow-up treatment on July 25, 2018, Plaintiff reported having low back pain and smoking a package of cigarettes a day. Dr. Ogundimu's examination showed the same results as the earlier examinations. Dr. Ogundimu continued Plaintiff's medication regimen. Plaintiff

returned on September 19, 2018, reporting his back pain had been controlled after undergoing stent placement in his abdominal aorta and his functional mobility and activities of daily living had been maintained by his medication regimen. Dr. Ogundimu's examination showed same results as earlier examinations. Dr. Ogundimu continued Plaintiff's medications as previously prescribed.

On October 17, November 14, and December 12, 2018, Plaintiff returned for medication refill follow-up and complained of leg and low back pain. Plaintiff indicated that his pain medications had improved his daily functioning, physical activities, and sleep. Dr. Ogundimu continued Plaintiff's medication regimen.

In follow-up treatment on January 9, 2019, Plaintiff reported improvement after having stent placement, his pain had been controlled, and his functional mobility and activities of daily living had been maintained by his medication regimen. Dr. Ogundimu's examination showed same results as earlier examinations. Dr. Ogundimu continued Plaintiff's medications as previously prescribed. On February 6, 2019, Plaintiff reported having low back and knee pain and having recent vein surgery in his left leg. Examination of his cervical and thoracic spines showed no tenderness to palpation and his lumbar spine mild tenderness. Dr. Ogundimu continued Plaintiff's medication regimen.

Plaintiff returned on March 6, 2019, and he reported that his pain had been controlled, and his functional mobility and activities of daily living had been maintained by his medication regimen. Dr. Ogundimu's examination showed the same results as previous examinations. Dr. Ogundimu continued Plaintiff's medications as previously prescribed.

In follow-up treatment on April 3, 2019, Plaintiff reported having low back and left leg pain. Dr. Ogundimu's examination showed same results as earlier examinations. Dr. Ogundimu adjusted Plaintiff's medication regimen.

A CT scan performed on April 12, 2019, showed minimal multilevel lumbar disc disease, multilevel lower lumbar moderate facet osteoarthritis, and multilevel neural foraminal stenosis spanning L4-S1. Plaintiff called Dr. Ogundimu about the results and admitted that he did not have a primary care physician.

On May 1, 2019, Plaintiff complained of chronic back and leg pain. Examination of his cervical and thoracic spine showed no tenderness to palpation and his lumbar spine mild tenderness. Dr. Ogundimu continued Plaintiff's medication regimen.

**D.** **Southeast Health Rural Health Clinic of Ripley** (Tr. 436-71, 504-20)

Between March 7, 2016 and December 26, 2017, a number of doctors and nurse practitioners treated Plaintiff at Southeast Health Rural Clinic.

From March 7, 2016, through July 27, 2017, Plaintiff returned once a month for medication refills for anxiety, depression, hypertension, and chronic back pain. During treatment on May 6, 2016, Plaintiff reported injuring his back when he stepped in hole.

A CT scan of Plaintiff's lumbar spine performed on August 24, 2016 showed no significant spondylolistheses, mild multilevel disc space narrowing, mild multilevel discogenic degenerative disease, moderate multilevel facet osteoarthritis.

On August 25, 2017, Plaintiff presented for treatment for back pain and anxiety.

**E.** **Missouri Vein Care – Dr. Michael Ryan** (Tr.472-78, 491-503, 587-99)

In treatment on September 26, 2017, Plaintiff presented with aching, swelling, fatigue, and pain while walking. Dr. Michael Ryan performed a bilateral lower extremity venous insufficiency

and vein study and diagnosed Plaintiff with varicose veins. The results of the study showed deep venous insufficiency of his veins. Dr. Ryan recommended refluxing Plaintiff's veins.

On January 5, 2018, a left lower extremity venous duplex scan performed by Dr. Ryan showed no evidence of venous insufficiency of Plaintiff's lower left extremity. In follow-up treatment, Plaintiff reported a pain level of 3/10 and having full activity post procedure. On January 23, 2018, Dr. Ryan injected Plaintiff's varicose veins.

On February 5, 2018, a bilateral lower extremity vein duplex study performed by Dr. Ryan showed no evidence of deep venous insufficiency of Plaintiff's bilateral lower extremity. Plaintiff reported having pain and tightness in his bilateral calves after walking short distances. In follow-up treatment, Dr. Ryan opined that Plaintiff exhibited symptoms of venous insufficiency and reflux based on the ultrasound results. Dr. Ryan noted that Plaintiff had a failed trial of compression stockings use and other conservative treatment. To treat Plaintiff's symptomatic veins, Dr. Ryan injected his veins and then applied compression hose pressure.

On September 28, 2018, Jennifer Backes completed an office evaluation. Plaintiff complained of pain in his legs, starting after surgery in November 2011. Plaintiff reported hunting and fishing as his activities. Plaintiff indicated that he had worn compression stockings since April 2017. Plaintiff explained that he had to sit to alleviate his pain before he could continue with his daily tasks. Ms. Backes observed that Plaintiff ambulated without assistance.

**F.    Midwest CES, LLC – Christy Murphy, NP** (Tr. 479-90)

On December 9, 2017, Christy Murphy, NP, completed a consultative disability evaluation. NP Murphy noted that Plaintiff alleged disability due to arthritis, hypertension, depression, and hearing loss. Plaintiff reported that his typical daily activity consisted of watching television and resting. Plaintiff reported functional limitations, secondary to pain, including sitting 30 minutes,

standing 30 minutes, walking less than a block, lifting and carrying 10 pounds, seeing, hearing, and travelling. Examination showed tenderness in Plaintiff's cervical and lumbar spine. NP Murphy observed Plaintiff could write a sentence and was able to get up and down from the exam table. NP Murphy observed that Plaintiff had a slow, limping gait.

### G. Doniphan Family Clinic – Bonita Hill, NP (Tr. 600-22)

During treatment on December 4, 2018, Plaintiff reported his occupation as disabled. NP Bonita Hill observed Plaintiff walking without restrictions. Plaintiff presented for a blood pressure check. Plaintiff reported not having any anxiety or depression. In follow-up treatment on December 12 2018, Plaintiff reported trying to stop smoking but his attempts had failed each time even using patches. NP Hill observed Plaintiff had a normal gait.

On January 28, 2019, Plaintiff returned for lab work.

### H. Poplar Bluff Regional Medical Center – Dr. Tom Brumitt (Tr. 558-86, 769-70)

On May 21 and June 1, 2018, Dr. Tom Brumitt performed bilateral lower extremity angiograms.

Plaintiff presented in the emergency room on September 14, 2018, for treatment of a hematoma.

### I. Southeast Hospital – Dr. Stanley Ziomek (Tr. 771-81)

On January 7, 2019, Plaintiff complained of bilateral leg pain and poor leg circulation . Plaintiff reported walking increased his pain and resting relieved his pain. Plaintiff requested surgical repair to be scheduled as soon as possible.

Dr. Stanley Ziomek preformed left femur bypass surgery on January 11, 2019, as treatment for Plaintiff's bilateral leg pain and lack of circulation. Diagnostic testing showed chronic degenerative spondylosis of Plaintiff's thoracic spine.

J.      **Black River Medical Center** (Tr. 782-803)

During treatment on April 24, 2019, Plaintiff reported that he had been advised to follow a cardiac diet but that he does not do so.

III.    **Opinion Evidence - Function, Disability, and Work History Reports** (Tr. 269-306)

In a Disability Report – Field Office, the interviewer noted Plaintiff appeared to be in a lot of pain and groaned in pain when he moved.

In a Disability Report – Adult, Plaintiff reported being able to read and understand English and to write more than his name in English and having learning problems. Plaintiff reported attending special education classes from 1976 to 1986 and completing eighth grade.

In a Function Report - Adult, Plaintiff reported that standing and sitting for long periods of time results in pain. Plaintiff indicated that he could pay bills and count change, but he cannot write a check or follow written instructions because he cannot read or spell very well. Plaintiff reported having a valid driver's license and being able to drive. His wife completed the function report.

In a Work History Report, Plaintiff reported last working in January 2014. Plaintiff reported that his legs cramp when he walks. His wife completed the work history report.

His wife completed a Disability Report – Appeal on behalf of Plaintiff.

IV.    **The Hearing Before the ALJ**

The ALJ conducted a hearing on August 20, 2019. Plaintiff was present with an attorney and testified at the hearing. The VE and Plaintiff's wife also testified at the hearing. (Tr. 88-95) At the beginning of the hearing, Plaintiff's counsel asserted that Plaintiff meets the definition of illiterate under the guidelines, and therefore, asked the ALJ to reopen the June 22, 2016, decision because counsel believed that Plaintiff would meet the guidelines of Grid Rule 201.17. (Tr. 77)

The ALJ denied this request, finding Grid Rule 201.17 did not apply to the instant case; and his contention that Plaintiff is illiterate is not consistent with the evidence. (Tr. 11)

### A.    <u>Plaintiff's Testimony</u>

Plaintiff testified that when he arrived for the hearing, he could not check into the facility because he does not know much about computers, and he cannot read. (Tr. 80) His wife completed the check-in process on his behalf. Plaintiff stated that he could not leave a note for a repairman, explaining what needed to be fixed, nor could he read a note left by a repairman explaining what had been fixed. Plaintiff indicated that he could not read a list of job tasks if written out by an employer. Plaintiff explained that he cannot write a check. (Tr. 80)

Plaintiff testified that he had struggled in special education classes through ninth grade and then repeated ninth grade before dropping out of school at age sixteen. (Tr. 81) Plaintiff explained that he dropped out of school because the other students made fun of his inability to read. (Tr. 81)

Plaintiff stated that he is forty-nine years old and completed the ninth grade. (Tr. 78) Plaintiff testified that he has a driver's license and sometimes drives no more than ten miles. (Tr. 79, 84)

Plaintiff testified that he last worked in June 2016, as a die casting machine operator, skilled work, and this job did not require him to read anything. (Tr. 79, 87)

Plaintiff testified that he cannot sit in one spot for long because he starts having shooting leg pain. (Tr. 81) Plaintiff indicated that he spends most of the day lying down due to back pain. (Tr. 82)

Plaintiff testified that he could lift about ten to fifteen pounds but that he could not stand and work or sit in the same spot for six hours. (Tr. 83) Plaintiff indicated that he would have to

miss a couple of days of work each week. (Tr. 83) Plaintiff does not do any of the household chores but he cuts the grass with a riding lawnmower. (Tr. 84)

The ALJ asked Plaintiff to explain why he represented that he could read and write in his disability application, but in some other forms he indicated that he could not read and write very well. (Tr. 85) Plaintiff explained that he can read short, easy words like "it" and "was." Plaintiff testified that he could not read to his children when they were three years old, and he can count some but not count change. (Tr. 86) Plaintiff explained that he was able to complete eighth grade because "[t]hey just passed me through." (Tr. 86)

### B.   Kim W's Testimony

Kim W, Plaintiff's wife, testified that Plaintiff cannot read the Social Security paperwork regarding his disability. (Tr. 88) Kim W explained that she reads all of Plaintiff's papers, and Plaintiff cannot write a check or a note to a repairman regarding repair work. (Tr. 89) Kim W indicated that a person could communicate verbally with Plaintiff, and he would understand what to do. (Tr. 89) When they arrived for the hearing, Kim W had to answer questions on behalf of Plaintiff. (Tr. 90)

### C.   The VE's Testimony

The VE identified Plaintiff's past work as a timber cutter, machine operator, and machine feeder, all medium level jobs. (Tr. 92)

The ALJ asked the VE a series of hypothetical questions to determine whether someone Plaintiff's age, education, work experience, and specific functional limitations would be able to find a job in the local or national economy. First, the ALJ asked the VE to assume a hypothetical individual with the capacity to occasionally lift ten pounds; walk or stand two hours out of an eight-hour workday; sit for six hours out of an eight-hour workday; balancing frequently; climbing

stooping, crouching, kneeling, or crawling occasionally; avoid loud background noise, unprotected heights, and hazardous moving machinery; and no prolonged exposure to cold temperature extremes and vibrating machinery. The VE responded that such a hypothetical person would not be able to perform any of Plaintiff's past work but the individual could perform sedentary, unskilled work such a sorter, assembler, and inspector. (Tr. 92-93)

Counsel asked if the individual was illiterate, would there be any jobs he could perform. (Tr. 93) The VE indicated that such individual would be able to perform the duties of the jobs she cited because these are jobs where the individual is shown how to perform the job duties without needing to read. (Tr. 94) Next counsel asked the VE to assume the same individual but the individual would need to lie down at an unscheduled time for up to one hour one to two days during the workday. (Tr. 94) The VE indicated that such individual could not perform the jobs she cited or any other work. Finally, counsel asked if the individual would have to miss work three times a month due to health problems would there be any jobs available. The VE opined that would preclude all competitive employment. (Tr. 94)

## V.    The ALJ's Decision

In a decision dated September 11, 2019, the ALJ determined that Plaintiff was not disabled under the Social Security Act. (Tr. 11-20) In response to counsel's request to reopen the prior ALJ decision dated June 22, 2016, and Plaintiff be awarded benefits under Medical-Vocational Guideline 201.17, on the basis of illiteracy, the ALJ denied this request for two reasons. First, the ALJ found that guideline 201.17 did not apply to the instant case because the guideline applies to younger individuals who are illiterate, and who either have no work history or a history of unskilled work. The ALJ noted that Plaintiff "has previous work experience performing semi-skilled and skilled occupations." (Tr. 11) Next, the ALJ found that Plaintiff's assertion that he is illiterate, is

not consistent with the evidence, including Plaintiff having an eighth grade education and being able to read and write.

The ALJ determined that Plaintiff had severe impairments of degenerative disc disease of the lumbar spine, hearing loss, and varicose veins of the lower extremities. (Tr. 13-15) The ALJ determined that Plaintiff had a residual functional capacity ("RFC") to perform sedentary work with the following modifications: (1) he is limited to lifting and/or carrying ten pounds occasionally; (2) he is limited to standing and/or walking for two hours out of an eight-hour workday; (3) he can sit for six hours out of an eight-hour workday; (4) he can occasionally climb stoop. kneel, crouch, and crawl; (5) he can frequently balance; and (6) he must avoid prolonged exposure to cold temperature extremes, vibrating machinery, unprotected heights, and hazardous moving machinery. (Tr. 16-18)

The ALJ found that Plaintiff's statements concerning "the intensity, persistence and functionally limiting effects of pain and other symptoms are not substantiated by objective medical evidence[,]" and his "symptoms can sometimes suggest a greater level of severity of impairments than can be shown by the objective medical evidence alone." (Tr. 16)

The ALJ identified that Plaintiff's past relevant work as a timber cutter, machine operator, and machine feeder. The ALJ found, based on the VE's testimony, that Plaintiff could not perform his past relevant work but he could perform a full range of sedentary work with specified limitations. The ALJ opined that while "the evidence does not support [Plaintiff's] contention that he is illiterate, the undersigned notes that the vocational expert testified that each of the jobs cited [by the VE] could be performed by an illiterate individual, as they are taught verbally, and by demonstration, and do not require the employee to be able to read." (Tr. 19) Therefore, the ALJ

found that Plaintiff was not under a disability within the meaning of the Social Security Act. (Tr. 30)

The ALJ's decision is discussed in additional detail below.

**VI.** <u>**Standard of Review and Legal Framework**</u>

"To be eligible for … benefits, [Plaintiff] must prove that [he] is disabled …." <u>Baker v. Sec'y of Health and Human Servs.</u>, 955 F.2d 552, 555 (8th Cir. 1992); <u>see also</u> <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001). Under the Act, a disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c (a)(3)(A). A plaintiff will be found to have a disability "only if [his] physical or mental impairment or impairments are of such severity that [he] is not only unable to do [her] previous work but cannot, considering [his] age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A) and 1382c(a)(3)(B). <u>See also</u> <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140 (1987).

Per regulations promulgated by the Commissioner, 20 C.F.R § 404.1520, "[t]he ALJ follows 'the familiar five-step process' to determine whether an individual is disabled…. The ALJ consider[s] whether: (1) the claimant was employed; (2) [he] was severely impaired; (3) [his] impairment was, or was comparable to, a listed impairment; (4) [he] could perform past relevant work; and if not, (5) whether [he] could perform any other kind of work." <u>Martise v. Astrue</u>, 641 F.3d 909, 921 (8th Cir. 2011) (quoting <u>Halverson v. Astrue</u>, 600 F.3d 922, 929 (8th Cir. 2010)). <u>See also</u> <u>Bowen</u>, 482 U.S. at 140-42 (explaining the five-step process).

The Eighth Circuit has repeatedly emphasized that a district court's review of an ALJ's disability determination is intended to be narrow and that courts should "defer heavily to the findings and conclusions of the Social Security Administration." Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010) (quoting Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001)). The ALJ's findings should be affirmed if they are supported by "substantial evidence" on the record as a whole. See Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008). Substantial evidence is "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Juszczyk v. Astrue, 542 F.3d 626, 631 (8th Cir. 2008); see also Wildman v. Astrue, 596 F.3d 959, 965 (8th Cir. 2010) (same).

Despite this deferential stance, a district court's review must be "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The district court must "also take into account whatever in the record fairly detracts from that decision." Id. Specifically, in reviewing the Commissioner's decision, a district court is required to examine the entire administrative record and consider:

1.  The credibility findings made by the ALJ.

2.  The claimant's vocational factors.

3.  The medical evidence from treating and consulting physicians.

4.  The claimant's subjective complaints relating to exertional and non-exertional activities and impairments.

5.  Any corroboration by third parties of the claimant's impairments.

6.  The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Sec'y of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (citation omitted).

Finally, a reviewing court should not disturb the ALJ's decision unless it falls outside the available "zone of choice" defined by the evidence of record. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011). A decision does not fall outside that zone simply because the reviewing court might have reached a different conclusion had it been the finder of fact in the first instance. Id.; see also McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010) (explaining that if substantial evidence supports the Commissioner's decision, the court "may not reverse, even if inconsistent conclusions may be drawn from the evidence, and [the court] may have reached a different outcome").

## VII.  Analysis of Issue Presented

In his brief to this Court, Plaintiff raises the following points of error:

1.  The ALJ failed to consider Plaintiff's functional illiteracy, failed to develop the record in that regard, and therefore failed to find that Plaintiff was disabled under Grid Rule 201.17.

2.  The ALJ erred in relying on the VE's testimony that Plaintiff could perform the jobs identified even if Plaintiff is illiterate because a finding of disability should have been directed by the Grids.

3.  The ALJ's determination that Plaintiff could perform a reduced range of sedentary work is not supported by evidence on the record as a whole.

4.  Based on the evidence at the hearing, Plaintiff established disability due to absenteeism.

The first two points Plaintiff raised are related and will be addressed together below.

### A.  Illiteracy and Grid Rule 201.17

Plaintiff argues that the ALJ should have considered him illiterate and, had the ALJ so found, he would be disabled pursuant to the Medical Vocational Guidelines Rule 201.17 ("Grid Rules") set out in 20 C.F.R., Part 404, Subpart P, Appendix 2. In support of this contention,

Plaintiff cites to his testimony and his wife's testimony at the administrative hearing, showing that he could not read or write simple messages.

### 1.    Substantial Evidence Supports the ALJ's Illiteracy Conclusions

The Social Security Administration considers education as a vocational factor and defines illiteracy as "the inability to read and write," and noted that, "[g]enerally, an illiterate person has had little or no formal schooling."  20 C.F.R. § 404.1564; see also Pena v. Astrue, 271 Fed. Appx. 382, 384 (5th Cir. 2008) ("A claimant's education is a vocational factor the ALJ considers in determining what jobs a claimant is capable of performing; illiteracy is one category of education.").  A claimant is not per se disabled if he is illiterate but his educational level, including whether the plaintiff is illiterate, is considered at step five.  Conversely, someone with a limited education has "ability in reasoning, arithmetic, and language skill, but not enough to allow a person with these educational qualifications to do most of the more complex job duties needed in semi-skilled or skilled jobs."  20 C.F.R. § 404.1564(b)(3).  A limited education is generally attained by reaching seventh through eleventh grade.  Id.

During the application process, Plaintiff reported being able to read and write but his wife apparently completed some of the disability paperwork for him.[3]  (Tr. 288, 291, 306)  Using Plaintiff's own account of his abilities as attested in his function reports, he can drive and ride a lawnmower, shop sometimes in a limited capacity, pay bills, count change, and has a driver's license.[4]  All of this is consistent with the ALJ's determination that Plaintiff had a limited

---

[3] The Disability Report – Adult and Work History Report are typed and unsigned.  (Tr. 272-80, 295)

[4] Although not addressed in the record, the Court notes that Plaintiff's ability to obtain a driver's license is consistent with the ALJ's determination concerning literacy.

education, rather than being illiterate, and that § 201.19 directed a finding of not disabled. Thus, the decision is based on substantial evidence. See, e.g., Williams v. Astrue, 2011 WL 1261339, at *10 (D.S.C. Feb. 2, 2011) (finding that functional illiteracy is not the same as definition of illiteracy in regulations).

At the administrative hearing, Plaintiff testified that he could read short simple words but he could not read to his children when they were three years old. Plaintiff further testified that he could count some but not count change. (Tr. 86) Plaintiff explained that he completed eighth grade because "[t]hey just passed me through." (Tr. 86) Likewise, Kim W testified that Plaintiff could not read the Social Security paperwork regarding his disability, and explained that she reads all of Plaintiff's papers, and Plaintiff could not write a note to a repairman regarding repair work or write a check. Kim W further indicated that a person could communicate verbally with Plaintiff, and he would understand what to do. (Tr. 89)

In support of his finding that Plaintiff was not illiterate, the ALJ found this contention was not consistent with the evidence, including Plaintiff reporting having an eighth grade education[5] and being able to read and write in disability reports, and testifying he can read short simple words. Taken together, this evidence supports the ALJ's decision that Plaintiff was not illiterate within the limited context of making a disability determination.[6]

---

[5] The undersigned notes that Plaintiff indicated that he had attended special education classes but there are no school records contained in the record. The record reflects that Plaintiff reached the eighth grade in school, taking special education classes, before dropping out of school. (Tr. 274) Thus, Plaintiff fits squarely within the definition of limited education as defined by the regulations.

[6] Moreover, the ALJ noted that the VE testified that the sedentary "jobs cited … could be performed by an illiterate individual, as they are taught verbally, and by demonstration, and do not require the employee to be able to read." (Tr. 19) Inasmuch as Plaintiff has failed to meet a grid, the ALJ properly relied on the VE's testimony regarding Plaintiff's ability to perform the jobs he cited.

The ALJ explained his reasons for finding Plaintiff is not illiterate, and those reasons are supported by the record evidence. The record evidence supports the ALJ's determination that Plaintiff is not illiterate, and the contrary hearing testimony does not require a different finding. Accordingly, the record contained substantial information to suggest that Plaintiff was not illiterate and was able to read and write. To accept Plaintiff's argument would require the Court to reweigh the evidence, which the Court will not do in this context. See Wiese v. Astrue, 552 F.3d 728, 739 (8th Cir. 2009) (explaining that a district court may not decide facts anew, reweigh the evidence or substitute its judgment for that of the ALJ); see also Partee v. Astrue, 638 F.3d 860, 863 (8th Cir. 2011) ("If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's finding, the court must affirm the ALJ's decision.") The ALJ did not err in in finding Plaintiff not illiterate.[7]

### 2. Substantial Evidence Supports the ALJ's Grid Application

The ALJ's decision notes that, at the hearing in this matter, Plaintiff's counsel asked that Plaintiff be approved for benefits under Medical-Vocational Guideline 201.17 due to his illiteracy. (Tr. 11) The ALJ explained that Grid Rule 201.17 "applies to younger individuals who are illiterate, and who either have no work history, or a history of unskilled work." (Id.) The ALJ concluded that Grid Rule 201.17 did not apply for two reasons. First, Plaintiff's past work history included skilled and semi-skilled work. Second, Plaintiff was not illiterate, noting that Plaintiff

---

[7] At step 5, the ALJ determined that there were jobs existing in significant numbers in the national economy that Plaintiff could have performed, using the Medical-Vocational Guidelines ("Grids"), 20 C.F.R. Pt. 404, Subpt. P. App. 2. Moreover, the ALJ noted that the VE testified that the jobs he cited could be performed by an illiterate person "as they are taught verbally, and by demonstration, and do not require the employee to be able to read." (Tr. 19) Significantly, Kim W testified at the hearing Plaintiff could communicate verbally with other persons and he would understand what to do.

previously reported he could read and write, and that Plaintiff testified that, despite having trouble reading, he can read short, simple words.  (Id.)

The series of rules found in 201.01 of Appendix 2 apply to persons whose maximum sustained work capability is limited to sedentary work as a result of a severe medically determinable impairment or impairments.  20 C.F.R., Pt. 404, Subpt. P, App. 2, §201.00.  Grid Rule 201.17 directs a decision where the claimant is a younger individual age 45 through 49, is illiterate or unable to communicate in English, and has only unskilled, if any, past work experience. 20 C.F.R., Pt. 404, Subpt P. App. 2 § 201.17.

The grids provide a tool to aid in making uniform, efficient decisions in determining the types and numbers of jobs existing in the national economy for certain classes of claimants. Heckler v. Campbell, 461 U.S. 458, 468 (1983).  The grids are applicable "only when they describe a claimant's abilities and limitations accurately."  Id, at 462 n.5.  Thus, the grids direct a finding in a particular case only when there is and "exact fit" between the criteria of the grid and the situation before the ALJ.  Id. at 468.

At the time of the ALJ's decision, Plaintiff was within the proper age range.  But Plaintiff is able to communicate in English and, as noted above, substantial evidence supports the ALJ's determination that Plaintiff is not illiterate within the relevant context.  Further, there is substantial evidence to support the ALJ's conclusion that Plaintiff's past work was not entirely unskilled. Therefore, Plaintiff was not an "exact fit" to Grid Rule 201.17.  See 20 C.F.R. Pt. 404, Subpt. P, App. 2, §210.17; 20 C.F.R. Pt. 404, Subpt. P, App.2, § 200.00(a) ("Where any one of the findings of fact does not coincide with the corresponding criterion of a rule, the rule does not apply in that particular case and, accordingly, does not direct a conclusion of disabled or not disabled."). Therefore, Grid Rule 201.17 does not apply.  The ALJ did not error in this finding.

### B.     **RFC Determination**

Plaintiff argues that the ALJ's RFC determination that he can perform a reduced range of sedentary work is not supported by substantial evidence. In particular, he contends that the ALJ failed to consider his belief that he would have to lie down during the workday. The VE testified that no work would be available for an individual who needed to lie down at an unscheduled time for up to one hour, one to two days during the workday.

A claimant's RFC is the most an individual can do despite the combined effects of his credible limitations. See 20 C.F.R. § 404.1545. "'The RFC 'is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities.'" Roberson v. Astrue, 481 F.3d 1020, 1023 (8th Cir. 2007) (quoting SSR 96-8p, 1996 WL 374184, at *3 (S.S.A. 1996)). An ALJ's RFC finding is based on all of the record evidence, the claimant's testimony regarding symptoms and limitations, the claimant's medical treatment records, and the medical opinion evidence. See Wildman v. Astrue, 596 F.3d 959, 969 (8th Cir. 2010); see also 20 C.F.R. § 404.1545; SSR 96-8p (listing factors to be considered when assessing a claimant's RFC, including medical source statements, recorded observations, and "effects of symptoms … that are reasonably attributed to a medically determinable impairment."). The ALJ must explain his assessment of the RFC with specific references to the record. SSR 96-8 (the RFC assessment must cite "specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)" in describing how the evidence supports each conclusion). Throughout this inquiry, the burden of persuasion to prove disability and to demonstrate RFC is on the claimant. Hensley v. Colvin, 829 F.3d 926, 932 (8th Cir. 2016). Disability is not determined by the presence of impairments, but by the effect the impairments have on the individual's ability to perform substantial gainful activity. 20 C.F.R. §§ 404.1545(e), 416.945(e).

"It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC." Pearsall, 274 F.3d at 1217. Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by substantial medical evidence that Plaintiff could perform the requirements of competitive work without having his pain result in impermissible levels of off-task behavior such as lying down and absenteeism. See Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).

Here, the ALJ found that Plaintiff had the RFC to perform sedentary[8] work, with additional enumerated limitations. Plaintiff argues that the RFC is not supported by substantial evidence that he could perform the requirements of competitive work due to his pain resulting in impermissible levels of off-task behavior, such having to lie down at an unscheduled time during the workday, and absenteeism.[9]

Significantly, Plaintiff's claim that he needs to lie down is without any support in the objective medical record. The only evidence in the record supporting Plaintiff's alleged need to lie down is his administrative hearing testimony and his function report. See Harris v. Barnhart, 356 F.3d 926, 930 (8th Cir. 2004) (explaining that the need to lie down is a medical question requiring medical evidence and noting that the record did not contain evidence to support that need); Zeiler v. Barnhart, 384 F.3d 932, 936 (8th Cir. 2004) (("[T]here is no medical evidence supporting [the claimant's] claim that she needs to lie down during the day."); Fredrickson v. Barnhart, 359 F.3d 972, 977 n.2 (8th Cir. 2004) ("There is no evidence in the record that [the claimant] complained of severe pain to his physicians or that they prescribed that he elevate his

---

[8] A limitation to sedentary work is itself a significant limitation. See, e.g., Ellis v. Barnhart, 392 F.3d 988.994 (8th Cir. 2005) (explaining that sedentary work is itself a significant limitation, showing the ALJ assigned some weight to the claimant's physician's opinion).

[9] Plaintiff's absenteeism argument is addressed in Subpart C.

foot or lie down daily."). The record before the Court reflects that Plaintiff never reported to any of his doctors that he needed lie down for sustained periods of time, and none of his treating doctors ever determined that Plaintiff should lie down during the day as a medical necessity.

Furthermore, the ALJ's determination is not inconsistent with the medical evidence, and nothing else in the record detracts from that determination. Based on the objective medical evidence and Plaintiff's testimony and after evaluating Plaintiff's subjective symptoms, the ALJ determined that Plaintiff retained the RFC to perform sedentary work with additional enumerated limitations.

Because the ALJ based his RFC assessment upon review of all the credible, relevant evidence of record, and the RFC is supported by some medical evidence, it will not be disturbed. See Baldwin v. Barnhart, 349 F.3d 549, 558 (8th Cir. 2003). See also Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005) ("An administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion."). The ALJ's determination of Plaintiff's physical RFC is based upon a thorough review of the record as a whole. The RFC is consistent with substantial medical evidence of record and other objective evidence.

### C.    **Absenteeism**

Plaintiff also contends that the ALJ erred in not finding him disabled because his condition would result in absenteeism issues which would preclude employment.[10]

The problem with Plaintiff's contention is that the record does not support a finding that Plaintiff's health problems would require him to miss work three times a month and would result in any additional limitations beyond the limitations imposed by the ALJ. Plaintiff has the burden

---

[10] Based on a question from Plaintiff's counsel, the VE testified that an individual suffering absenteeism, in excess of three absences per month due to health problems would be unable to perform any competitive employment.

to prove his RFC.  Pearsall, 274 F.3d at 1217.  Plaintiff has not met his burden because he has not presented evidence, showing the need to miss work three times a month.  See, e.g., Miller v. Berryhill, 2017 WL 3642035, at *7 (E.D. Mo. Aug. 24, 2017); Eberhart v. Colvin, 2014 WL 3956480, at *13-14 (E.D. Mo. Aug. 13, 2014).   Plaintiff's contention rests on his and his wife's hearing testimony.  But the record does not show that Plaintiff had absenteeism issues when working.  And none of Plaintiff's treating sources ever indicated that Plaintiff's impairment would cause attendance problems.  Plaintiff's subjective beliefs regarding absenteeism are not entirely consistent with or supported by the record.  Conversely, there is substantial evidence in the record as whole to support the ALJ's determination that Plaintiff was capable of performing sedentary work, with some limitations that did not include absenteeism.  Therefore, the ALJ's decision not to find Plaintiff disabled due to absenteeism is supported by substantial  evidence on the record as a whole.

There is, no doubt, some medical evidence in the record that supports Plaintiff's complaints of disabling pain, including records showing that despite improvement with treatment, Plaintiff consistently reported back pain.  The fact that Plaintiff experienced pain does not require a finding of substantial absenteeism issues or disability.  See Perkins v. Astrue, 648 F.3d 892, 900 (8th Cir. 2011) ("While pain may be disabling if it precludes a claimant from engaging in any form of substantial gainful activity, the mere fact that working may cause pain or discomfort does not mandate a finding of disability.").

## VIII.   Conclusion

When reviewing an adverse decision by the Commissioner, the Court's task is to determine whether the decision is supported by substantial evidence on the record as a whole.  Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001).   "Substantial evidence is defined to include such relevant

evidence as a reasonable mind would find adequate to support the Commissioner's conclusion.  Id.

Where substantial evidence supports the Commissioner's decision, this Court may not reverse the

decision merely because substantial evidence exists in the record that would have supported a

contrary outcome or because another court could have decided the case differently.  Id.; see also

Igo v. Colvin, 839 F.3d 724, 728 (8th Cir. 2016).  For the foregoing reasons, the Court finds that

the ALJ's determination is supported by substantial evidence on the record as a whole.  See Finch,

547 F.3d at 935.  Similarly, the Court cannot say that the ALJ's determinations in this regard fall

outside the available "zone of choice," defined by the record in this case.  See Buckner, 646 F.3d

at 556.  For the reasons set forth above, the Commissioner's decision denying benefits is affirmed.

Accordingly,

    **IT IS HEREBY ORDERED** that the decision of the Commissioner be **AFFIRMED**.

    A separate Judgment shall accompany this Memorandum and Order.

Dated this 22nd day of June 2021


                                    /s/ John M. Bodenhausen
                                    JOHN M. BODENHAUSEN
                                    UNITED STATES MAGISTRATE JUDGE